1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   DONOVAN DEWAYNE PULLEN,              No.  1:16-cv-00118-DAD-JLT (HC)

12          Petitioner,                   **FINDINGS AND RECOMMENDATION
                                          TO DENY PETITION FOR WRIT OF**
13      v.                                **HABEAS CORPUS**

14   JOE LIZARRAGA,                       **[TWENTY-ONE DAY OBJECTION
                                          DEADLINE]**
15          Respondent.

16

17          Petitioner is currently serving a sentence of 25 years and 4 months for convictions

18   stemming from an assault on his wife.  In this instant habeas action he claims: 1) The trial court

19   denied him his Fourteenth Amendment due process rights by denying his <u>Trombetta</u>/<u>Youngblood</u>

20   motion based on the prosecution's willful failure to preserve evidence; 2) The prosecutor

21   committed misconduct during closing argument by violating a mid-trial agreement about the

22   inadmissibility of the victim's prior criminal record in violation of his due process rights; and 3)

23   The trial court abused its discretion and violated Petitioner's constitutional rights during the

24   sanity phase of the trial by refusing to investigate a juror's alleged inattention, and then by

25   denying Petitioner's motion for a new sanity trial.  As discussed below, the Court finds the claims

26   to be without merit and recommends the petition be **DENIED.**

27   **I.      PROCEDURAL HISTORY**

28          Petitioner was convicted in the Fresno County Superior Court on December 14, 2012, of

1

corporal injury to a spouse/cohabitant (Cal. Penal Code § 273.5(a)), assault by means likely to produce great bodily injury (Cal. Penal Code § 245(a)(4)), and criminal threats (Cal. Penal Code § 422). People v. Pullen, No. F066371, 2015 WL 847688, at *1 (Cal. Ct. App. 2015). Special allegations that Petitioner personally inflicted great bodily injury under circumstances involving domestic violence (Cal. Penal Code § 12022.7(e)), one prior strike conviction (Cal. Penal Code §§ 667(b)–(i), 1170.12(a)–(d)), one prior serious felony enhancement (Cal. Penal Code § 667(a)(1)), and four prior prison term enhancements (Cal. Penal Code § 667.5(b)), were found to be true. Id.

Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth DCA"). The Fifth DCA affirmed the judgment on February 26, 2015. Id. Petitioner filed a petition for review in the California Supreme Court, and the petition was summarily denied on June 10, 2015. Id.

On January 4, 2016, Petitioner filed the instant petition for writ of habeas corpus in this Court. (Doc. No. 1.) Respondent filed an answer on May 24, 2016. (Doc. No. 21.) Petitioner filed a traverse on July 25, 2016. (Doc. No. 27.)

## II.   FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision[1]:

### *Defendant's Prior Acts of Domestic Violence*

Defendant and Luevater Fulmer (Fulmer) had known each other since they were children and lived together for several years before their marriage.

In 2003, defendant and Fulmer argued because he accused her of cheating on him. Fulmer started to leave their apartment. Defendant hit her and knocked her out, and Fulmer did not remember anything after that. Fulmer woke up in the hospital four days later. Her jaw had been broken in three places, and she had a shattered cheek bone. Fulmer testified her "whole memory lapsed" as a result of the incident. Defendant was convicted of assault by means likely to produce great bodily injury, with a great bodily injury enhancement.

In 2004, defendant and Fulmer were married.

In June 2009, defendant and Fulmer argued because he wanted to have sex and she

---

[1] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). Therefore, the Court will rely on the Fifth DCA's summary of the facts. Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).

refused. Defendant grabbed her neck and pinned her to the wall. Defendant warned Fulmer that he would snap her neck if she moved.

### Defendant's Statements to Joann Espinoza

In August 2009, defendant and Fulmer were living in an apartment complex. One day, defendant saw their neighbor, Joann Espinoza (Espinoza), as she was about to drive out of the parking lot. Defendant asked for a ride and she agreed.

Espinoza testified defendant got into her car, and he was very upset and distraught. Defendant said he and Fulmer were fighting. He said Fulmer was having sex with "other guys behind his back." Defendant said he wanted to kill Fulmer because she caused him too much anguish. Espinoza told defendant to leave the relationship if it was that bad. Defendant did not appear under the influence, and he did not threaten to kill himself.

Espinoza testified she did not take defendant's threat to kill Fulmer seriously. She did not tell Fulmer, and she did not call the police because "it's just the way people talk." [N.3]

> [N.3] It was stipulated that Espinoza had a misdemeanor conviction for grand theft (§ 487) in 2000.

### THE CHARGED OFFENSES

Fulmer testified that around 1:00 a.m. on September 1, 2009, she was sitting on a chair in front of their apartment. [N.4] Two men walked past her. She did not know them.

> [N.4] Fulmer testified she may have consumed a beer and smoked marijuana on August 30, 2009.

Defendant arrived at the apartment complex on his bicycle and saw the two men. Defendant raised his voice and accused Fulmer of talking to the men. He asked why they rushed away. Fulmer replied the men did not speak to her, and they just walked by. Defendant did not believe her. He accused her of cheating and flirting with the men.

Fulmer testified she did not want to argue with defendant, and she went inside their apartment. Defendant followed her. Fulmer sat on the couch and watched television. She was going to smoke marijuana. Defendant stood in front of the television and asked why she was cheating on him. Fulmer again denied she talked to the men.

Defendant ran up to Fulmer and repeatedly punched her in the head. Fulmer tried to block the blows, and she kicked him away from her. She tried to escape out the door, but defendant grabbed her around the neck. He threw her to the floor, sat on top of her, choked her with both hands, and said he was going to kill her. Fulmer could not breathe and was gasping for air. She thought she was going to die. She tried to scratch and punch defendant. Fulmer testified "everything went black," and she briefly lost consciousness.

Fulmer woke up and discovered defendant was still sitting on top of her stomach in the living room. His hands were around her neck and he said, "'Bitch, I'm gonna kill you.'" Defendant squeezed her throat, and Fulmer again lost consciousness.

When she woke up, defendant was still on top of her. He said: "'Bitch, I'm gonna kill you, and then I'm gonna kill myself. They gonna find both of us dead up in this house.'" Fulmer believed defendant was going to kill her because "he never choked me out like that before." He choked her with more force than he used during the previous month's incident. Fulmer tried to punch and kick defendant, but he stayed on top of her. Defendant started to squeeze her neck again, and Fulmer turned to her side to protect herself.

As Fulmer turned, defendant grabbed her head and slammed it on the living room floor three times. Fulmer passed out again and was unconscious for a longer period of time.

Fulmer testified that when she woke up, she was still lying on the living room floor, and her head was in a large pool of blood. She tried to sit up, but her hands slipped and smeared the blood on the floor. Defendant was sitting on the living room floor with his back against the wall, and said, "I'm going back to jail." Defendant also said: "I promised God I wouldn't hurt you no more," and "I promised you that I wouldn't hurt you no more." Fulmer knew he was talking about the previous domestic violence incidents.

Fulmer and defendant got up and sat on the couch. She tried to keep him calm so she could escape. Fulmer told defendant she forgave him, and they would keep things quiet. Defendant grabbed her hand and said he did not know what he was going to do next. After 30 minutes, Fulmer felt she was going to pass out from her injuries, and blood was running down the side of her head. Defendant positioned a fan to blow on her, but she still felt like she was going to faint. Defendant walked Fulmer to the closet to get a towel. He walked her into the bathroom, wet the towel, and then walked her back to the couch. Fulmer pressed the towel on her head and tried to stop the blood. There was blood all over her shirt.

Defendant told Fulmer that he was going to kill himself. He dragged her to the kitchen and grabbed a steak knife from the drawer. Fulmer tried to resist and get away, but defendant pulled her down to the dining room floor, and sat next to her.

Defendant and Fulmer sat together on the dining room floor. Defendant said he was going to kill himself. Fulmer told him no. Defendant repeated that he was going to kill himself. He pressed the knife against his own stomach, but he did not break the skin. Fulmer testified defendant never threatened her with the knife or placed it against her stomach.

Fulmer testified as defendant pressed the knife to his stomach, he stopped and said, "'No I'm not gonna kill myself.... You kill me because I don't want to lose my soul in hell.'" Fulmer repeatedly refused. Defendant placed Fulmer's hand on the knife handle and tried to push her hand down so the knife was on his stomach.

After a few minutes, Fulmer resisted defendant and pushed away the knife. Defendant let her go and said he was just going to kill himself. Fulmer ran to the door. Defendant told her to take her cell phone. Fulmer was afraid he was going to stop her, so she ran out of the apartment without her cell phone.

Fulmer testified that when she ran out of the apartment, defendant was still sitting on the dining room floor, and he was holding the knife.

4

### The 911 Call

Fulmer pounded on Espinoza's door for help. Espinoza testified Fulmer was screaming and crying, and said she had to call 911 because defendant had beat her. Fulmer was bleeding from her forehead. Espinoza gave Fulmer the telephone and a towel to stop the bleeding. Espinoza testified Fulmer was shaken and distraught.

At 3:00 a.m., Fulmer called 911 and told the dispatcher that defendant "'choked me out'" and "'busted my head on the floor.'" Fulmer said defendant was trying to kill himself, that she was afraid for her life, and she was scared to go home because she might find her husband lying on the floor dead. [N.5]

> [N.5] The 911 recording was played for the jury. The parties were unable to agree as to whether the transcription was true and accurate. The court instructed the jury to make that determination.

As Fulmer waited for the police to arrive, she was still crying and upset. Espinoza testified Fulmer said defendant tried to kill her, that he had choked her and tried to use a knife to stab her in the stomach. [N.6]

> [N.6] At trial, Fulmer denied that she told Espinoza that defendant threatened to cut her with the knife and testified that never happened.

### The Initial Investigation

At 3:13 a.m., Officer Pierce Masse arrived at the apartment complex with his field training officer and six to eight additional officers. [N.7] He spoke to Fulmer outside Espinoza's apartment. Masse testified Fulmer's face, neck and shirt were covered with blood. Her left eye, cheek, and forehead were swollen. There was a one-inch laceration on her left eye, and she had scrapes and bruises on her knees, left wrist, and minor swelling on her left forearm. She held a towel against the left side of her head, through which blood was seeping. Masse called an ambulance for Fulmer.

> [N.7] Officer Masse testified that when he investigated this case, he had been a peace officer for about five weeks, he was still in training with his training officer, and he had graduated from the six-month program at the police academy.

Officer Masse testified Fulmer was upset but calm. Fulmer said defendant was in her apartment, he had a knife, and he said that he was going to kill himself. Fulmer gave her consent for the officers to enter her apartment.

Officer Masse asked the dispatcher to call the cell phones for both Fulmer and defendant so they could talk to defendant. Defendant did not answer.

### Entry into the Apartment and Discovery of Defendant

Officer Masse and other officers approached Fulmer's apartment. Masse opened the outer security door, and the front door was already open. Masse looked inside and saw defendant lying face down on the dining room floor in a pool of blood. Defendant was on his right side and his right hand was over his head. His left hand was lying in the blood. [N.8] He was not moving. A knife was on the floor, about eight feet away from defendant.

[N.8] Upon reviewing a photograph taken of the dining room, Fulmer testified that it showed a large pool of blood, and that she did not bleed that much from her head wound.

The officers rushed in and placed defendant in handcuffs before he could react or grab the knife. Defendant looked at Officer Masse with a blank stare. Masse discovered defendant had a large laceration on his left wrist, which was bleeding and covered with blood. Defendant was taken into custody and a second ambulance was called for him. Masse was unable to obtain a statement from defendant.

### Fulmer's Statement at the Scene

After defendant was taken into custody, Officer Masse conducted a longer interview with Fulmer as she was being treated by paramedics at the apartment complex. Fulmer said defendant arrived at their apartment on his bicycle just as three men walked by. Defendant asked why she was talking to them and accused her of cheating on him. Fulmer said she walked into the apartment and sat on the couch because she did not want to argue with him. Defendant punched her in the face. Fulmer said she was stunned, and she kicked at him to get away. Defendant punched her eight or 10 times, grabbed her throat with both hands, and choked her. Fulmer struggled and defendant said he was going to kill her. She lost consciousness.

Fulmer said when she woke up, defendant still had his hands around her throat. He again said he was going to kill her. He squeezed her throat and she passed out. Fulmer said she woke up, and defendant threw her to the floor, sat on top of her, and started to choke her again. Fulmer said she tried to kick and scratch him, but he was larger than her. Defendant slammed her head into the ground, and she might have lost consciousness.

Fulmer said defendant eventually helped her up, and they sat on the couch. He apologized, but then he dragged her to the kitchen. Defendant grabbed a knife and said he was not going to kill her, but he was going to make Fulmer kill him. Defendant held the knife against his abdomen and placed Fulmer's hand against the knife. Defendant again said he was going to make Fulmer kill him. Fulmer tried to calm defendant and pleaded with and apologized to him. Defendant calmed down, and she threw the knife on the floor. Fulmer said they sat and talked for nearly two hours, and she tried to keep him calm. Defendant apologized for hurting her. Defendant suddenly became angry again and told her to leave because he was going to kill himself. Fulmer ran to the neighbor's home and called 911.

### Espinoza's Statement

After he spoke to Fulmer, Officer Masse interviewed Espinoza, who was initially reluctant to answer questions. Espinoza said Fulmer ran into her apartment and asked to call 911. Espinoza said she did not hear defendant and Fulmer arguing, and she did not see what happened.

Espinoza told Officer Masse about the prior incident when she gave defendant a ride. Defendant was upset and said he was planning to kill Fulmer because she was cheating on him. Espinoza said defendant seemed really serious, and he was not joking when he said that. However, Espinoza did not tell Fulmer about the threat or report it to the police. [N.9]

[N.9] Espinoza was reluctant to testify and explained that prior to trial, her former boyfriend had been held in jail with defendant. He told Espinoza that defendant had confronted him and threatened Espinoza.

### Crime Scene Evidence

Officer Masse testified that when he initially entered the apartment and found defendant, he also found two separate pools of blood. One pool was on the dining room floor. Defendant was lying in this pool of blood, and his left hand was bleeding into it. The second pool of blood was on the living room floor. Masse testified the blood on the living room floor had been smeared, but there was no blood trail or drops between the two pools of blood and the knife.

Carmen Robles, the police department's crime scene technician, also testified that she found two separate pools of blood on the living and dining room floors, and there was no blood trail between the two locations. A kitchen knife was on the dining room floor, and there was blood on the blade.

Both Officer Masse and Ms. Robles testified that blood samples were not taken from the blood pools on the dining and living room floors, or from the knife. Masse testified that he discussed the blood evidence with his field training officer and Ms. Robles. Masse testified that he decided not to ask Ms. Robles to collect any blood samples because there was no real question about the sources of the blood. Masse testified that when he initially entered the apartment, defendant was lying face down on the dining room floor, his left wrist was cut, it was bleeding, and he was lying in the pool of blood. Masse testified that Fulmer said defendant assaulted her in the living room, and the blood and smears on the living room floor were consistent with her description of her struggle with defendant.

Officer Masse testified his field training officer agreed with his decision not to order the collection of blood samples. Ms. Robles collected the knife and processed it for fingerprints, and the results were negative. [N.10]

[N.10] In issue I, *post*, we will address defendant's claim that the People's failure to obtain and preserve blood samples from the living and dining room floors violated his due process rights under *Trombetta* and *Youngblood* because the evidence would have been exculpatory and supported his version of the incident. At trial, defendant claimed for the first time that Fulmer assaulted and stabbed him in the living room, and his blood was on the living room floor.

Officer Masse conceded he did not absolutely know whose blood was on the dining and living room floors. However, he believed the blood on the dining room floor was from defendant based on the scene he encountered when he entered the apartment. Masse further believed the blood on the living room floor was from Fulmer based on the detailed account she gave of the assault.

Officer Masse testified Fulmer was holding a towel to her head wound when he initially contacted her at Espinoza's apartment. The towel did not appear to be relevant evidence and he did not collect it. He did not collect Fulmer's bloody shirt, and he did not find or collect the towel that defendant gave Fulmer in the apartment to stop the bleeding. [N.11]

[N.11] The defense also cross-examined Officer Masse about his failure to collect a bloody "towel" depicted in photographs of the dining room area.

However, additional trial evidence revealed the item was actually gauze used by the paramedics to stop defendant's bleeding.

***Medical Evidence***

### *Fulmer*

Both Fulmer and defendant were taken to the hospital and treated in the emergency room by Dr. Geoffrey Stroh. Dr. Stroh testified that Fulmer had a two-centimeter laceration on her left temple, above her eye. It was superficial and not deep. She needed three stitches to close the laceration.

Fulmer also had swelling, a superficial laceration, and abrasions on her left cheek and the left side of her neck, swelling on her scalp, and scrapes on her knees. She had redness on her chest which extended from the left upper side to the base of her neck. There was also redness on her left forearm and right kneecap.

A CT scan revealed a depressed fracture to Fulmer's right cheekbone. The bone had been pushed inward, but it was still intact. Dr. Stroh was not sure whether the fracture was a new injury and noted the radiology report failed to indicate whether it was an old or healed injury.

Fulmer told the medical staff she had been choked, thrown against the floor, and she lost consciousness. Dr. Stroh presumed Fulmer suffered a concussion based on her head injuries and her description of losing consciousness.

### *Defendant*

The paramedic who treated defendant at the apartment testified he was moaning and unresponsive to commands. Defendant had a jagged cut to his left wrist that was oozing blood. As the paramedics rendered care, defendant showed some alertness. By the time defendant arrived at the hospital in police custody, he was oriented and able to speak.

Dr. Stroh testified defendant had a three-centimeter laceration on his left wrist, which consisted of one large cut and perhaps two smaller cuts. The wound was not deep, it was superficial, and it was not bleeding. The wound was closed with a suture. He did not have any other injuries. Defendant told the medical staff he cut his left wrist with a steak knife while he was sitting down; he felt dizzy; and he laid down.

Dr. Stroh reviewed the photographs of the blood in the living and dining rooms. He testified that either amount of blood could have come from Fulmer's scalp wound or defendant's wrist laceration.

### ***DEFENSE EVIDENCE***

Defendant was the only defense witness.

### ***The Prior Domestic Violence Incidents***

Defendant testified he had a felony conviction in 1993 for stealing a truck. He claimed Fulmer's brother loaned the truck to him; he did not know it was stolen; and he was arrested because he had drugs in his pocket. Defendant admitted that in 2003, he was convicted for assault with means likely to cause great bodily injury

and that he caused great bodily injury. Defendant testified he hit Fulmer "a couple of times" when they argued about whether she had been "messing" with his brother.

Defendant admitted he grabbed Fulmer in June 2009, but denied that he grabbed her throat and pinned her against the wall. Defendant testified the incident occurred because Fulmer wanted to smoke crack, she was irritable, and she was "going off."

### The Charged Offenses

Defendant testified that he rode his bicycle to his apartment around 10:00 p.m. on August 31, 2009, and saw two men walking away. He recognized one man as someone he had beaten and thrown out of his apartment a few months earlier.

Defendant went into the apartment and confronted Fulmer with his concerns about the men. He believed the men were molesting their grandchildren because he had seen "stuff" in his granddaughter's panties. He also believed Fulmer was cheating on him. Defendant thought Fulmer had previously put something in his drink to knock him out when their granddaughter spent the night, so he would not know what was going on.

Defendant testified Fulmer became offensive, and said he was "trippin' " and lying. Defendant threatened to report Fulmer for child molestation. They argued, and Fulmer walked into the kitchen.

Defendant testified he sat on the couch and watched television. Fulmer walked up to the couch, and he suddenly felt something hit his wrist. Fulmer was holding a knife and defendant's left wrist was bleeding. Defendant pushed her back, jumped off the couch, and punched her more than twice in the head. Fulmer "crunched" down and defendant "clobbered her on the top of her head" two more times, and she had a cut on her head.

Defendant testified he was afraid Fulmer would stab him with the knife again, and he would die. He used force to defend himself, even though Fulmer was smaller than he was, because she was strong, a little dangerous, and tough when she was angry. [N.12] He believed Fulmer stabbed him because she feared he would report her involvement with the two men and their granddaughter's purported molestation. [N.13]

> [N.12] Defendant admitted he was a trained boxer who fought 40 bouts. Defendant was six feet seven inches tall, and weighed 240 to 260 pounds. Fulmer was five feet four inches tall and weighed 110 pounds.

> [N.13] At trial, Fulmer testified she did not inflict any injuries on defendant, she did not cut him with the knife, she did not knock him out, and she did not try to kill him. She might have kicked him when she was trying to push him away.

Defendant testified he "rushed" Fulmer to take away the knife. He "took her down" to the living room floor. He held her hand and wrist and tried to get the knife. Fulmer flipped around, and they wrestled on the floor. He finally got the knife and threw it under the couch. Defendant lay on top of Fulmer's stomach with all his weight.

Defendant testified he picked up Fulmer, and they both stood up. His arm was bleeding, and he took off his tank top shirt and wrapped it around the wound. They went into the kitchen, and Fulmer used a dish towel to stop her bleeding. They talked about their argument, and Fulmer smoked "weed."

About an hour later, defendant told Fulmer he would patch himself up. Fulmer said she would help fix his wound. However, Fulmer ran out the door and left.

Defendant panicked when she left and felt "something was going to go bad" because he was on parole, and there was marijuana in the apartment. He walked to the dining room table and passed out. His wrist was still wrapped in his shirt. [N.14] Defendant testified the knife was not in the dining room when he passed out. He did not remember being handcuffed. He woke up when he heard the ambulance siren.

> [N.14] Officer Masse testified that when he entered the apartment, defendant was lying on the floor and nothing was wrapped around his wrist wound. Masse never saw a bloody shirt in the apartment.

Defendant testified the blood found on the living room floor resulted from Fulmer stabbing his wrist. He did not know whose blood was on the dining room floor where he was found. "It wasn't tested.... It could have been somebody else['s] blood. It could be her blood. ...." Defendant admitted Fulmer was injured and bleeding after he hit her, but "it wasn't that much blood." Defendant did not know whether the knife on the dining room floor was the same weapon that Fulmer used to stab him, and thought it might be covered in paint or tomato paste instead of blood.

Defendant denied Fulmer's entire account of the incident. He claimed he never put his hands around Fulmer's neck, choked her, slammed her head on the floor, apologized for beating her again, threatened to kill himself, asked Fulmer to kill him with the knife, or slit his own wrist. However, defendant "guess[ed]" he might have caused her injuries. Defendant denied making the statements attributed to him by Fulmer, Espinoza, Officer Masse, and the hospital staff.

Defendant testified he spoke to Officer Masse at the hospital and said that Fulmer slit his wrist. Defendant told Masse that Fulmer put something in his drink to knock him out, she allowed someone to molest their granddaughter, and he could not sleep because Fulmer left at night to cheat on him. Defendant denied that he said there were naked children in his apartment.

Defendant testified that after he was arrested, Fulmer wrote and visited him in jail, put money in his jail account, and sent him photographs. He believed that Fulmer did not want him to talk about her involvement in child molestation. [N.15] Defendant claimed he tried to report Fulmer to child protective services, but it did not investigate his allegations. [N.16]

> [N.15] Espinoza testified she spoke to Fulmer after defendant had been taken into custody. Fulmer said she had second thoughts about the case and felt bad about him going to jail.

> [N.16] Traci Morales of the Department of Social Services testified that in July 2012, she received a referral and investigated allegations that defendant's granddaughter had been molested. Morales concluded the allegations were unfounded and closed the case in August 2012.

10

Officer Masse interviewed defendant at the hospital at 5:38 a.m. Defendant was coherent, cooperative, and respectful. Masse asked defendant about the cut on his wrist. Defendant did not answer the question. Instead, defendant said Fulmer smoked crack, and he could not sleep because she would leave the apartment and cheat on him. Masse again asked what happened. Defendant said they argued about why she was cheating on him; he was angry; he "snapped," and his next recollection was waking up on the floor with the cut on his wrist. Defendant said he might have punched Fulmer, but he could not remember, and he was not sure. Defendant never said Fulmer cut him with the knife.

Officer Masse testified defendant vaguely talked about child molestation and said there were naked babies in the bedroom, and Fulmer was possibly responsible. Masse asked for more details, but defendant could not provide the children's names, why Fulmer was involved, or what happened. Defendant became emotional. He said, "The babies, the babies" and sobbed. Masse testified he did not include these statements in his report because defendant seemed to be rambling and did not provide any information for following up.

Officer Masse was asked to review the "nurses' notes" from the hospital, which indicated that defendant said: "F my wife. I don't want to kill myself." Masse testified he never heard defendant make this statement.

Pullen, 2015 WL 847688, at *1–9.

## III.     DISCUSSION

### A.     Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3);  Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Fresno County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.      Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-406).

In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Cullen v. Pinholster, 563 U.S. 170, 203 (2011). Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Harrington, 562 U.S. at 103.

The second prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997). A state court's

factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), *cert.denied*, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

C.    Review of Claims

The instant petition presents the following grounds for relief: 1) The trial court denied him his Fourteenth Amendment due process rights by denying his Trombetta/Youngblood motion based on the prosecution's willful failure to preserve evidence; 2) The prosecutor committed misconduct during closing argument by violating a mid-trial agreement about the inadmissibility of the victim's prior criminal record in violation of his due process rights; and 3) The trial court abused its discretion and violated Petitioner's constitutional rights during the sanity phase of the trial by refusing to investigate a juror's alleged inattention, and then by denying Petitioner's motion for a new sanity trial.

1.    Failure to Preserve Evidence

Petitioner contends that the investigating officers failed to preserve evidence of two pools of blood, one in the living room and another in the dining room. He claims this evidence would have supported his claim of self-defense and exonerated him. He argues that the trial court violated his constitutional rights when it denied his motion to sanction the prosecution for its failure to preserve that evidence.

13

In an undisturbed opinion, the Fifth DCA rejected the claim, as follows:

## I.     Denial of *Trombetta/Youngblood* motion

Defendant contends the court violated his federal and state due process rights by denying his pretrial motion, brought pursuant to *Trombetta* and *Youngblood*, to sanction the prosecution because of Officer Masse's "willful failure" to collect and preserve the blood on the living and dining room floors. Defendant argues the blood evidence could have been exculpatory and shown that his blood was on the living room floor. Defendant argues the blood evidence would have been consistent with his trial testimony that he did not initiated the attack upon Fulmer, but that she stabbed him in the living room. As we will explain, defendant's due process rights were not violated in this case.

### A.  *Trombetta/Youngblood*

We begin with the applicable legal standards. Law enforcement agencies have a duty under the due process clause of the Fourteenth Amendment to preserve evidence "that might be expected to play a significant role in the suspect's defense." (*Trombetta, supra*, 467 U.S. at p. 488, fn. omitted.) To fall within the scope of this duty, the evidence "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*Id*. at p. 489.)

The state's responsibility is further limited when the defendant's challenge is based on the failure to preserve potentially exculpatory evidence—that is, "evidentiary material of which no more can be said than that *it could have been subjected to tests, the result of which might have exonerated the defendant*." (*Youngblood, supra*, 488 U.S. at p. 57, italics added.) "[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." (*Id*. at p. 58; *People v. DePriest* (2007) 42 Cal.4th 1, 41–42.)

"The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed. [Citation.]" (*Youngblood, supra*, 488 U.S. at pp. 56–57, fn. *.) It is significant whether the state knew the evidence could form a basis for exonerating the defendant and failed to preserve it as part of a conscious effort to circumvent its constitutional discovery obligation. (*Trombetta, supra*, 467 U.S. at p. 488.) The negligent destruction of, or failure to preserve, potentially exculpatory evidence, without evidence of bad faith, will not give rise to a due process violation. (*Youngblood, supra*, 488 U.S. at p. 58.)

Thus, there is a distinction between *Trombetta's* "exculpatory value that was apparent" criteria and the standard set forth in *Youngblood* for "potentially useful" evidence. If the higher standard of apparent exculpatory value is met, the motion is granted in the defendant's favor. But if the best that can be said of the evidence is that it was "potentially useful," the defendant must also establish bad faith on the part of the police or prosecution. (See *Youngblood, supra*, 488 U.S. at p. 58; *Trombetta, supra*, 467 U.S. at pp. 488–489; *People v. Alvarez* (2014) 229 Cal.App.4th 761, 773.)

"On review, we must determine whether, viewing the evidence in the light most favorable to the superior court's finding, there was substantial evidence to support

14

its ruling" on a *Trombetta/Youngblood* claim. (*People v. Roybal* (1998) 19 Cal.4th 481, 510.)

### B. Pretrial Motion

Defendant filed a motion in limine pursuant to *Trombetta* and *Youngblood*, and argued the People's failure to collect or preserve any samples from the two pools of blood resulted in the intentional, bad faith loss and destruction of material evidence in violation of his due process rights. Defendant argued the evidence would have been exculpatory and shown that his blood was on the living room floor, which would have supported his trial theory that Fulmer attacked him in the living room with the knife. Defendant asked the court to fashion an appropriate sanction.

At a pretrial hearing, however, defense counsel equivocated about the reason for his *Trombetta /Youngblood* motion.

"[DEFENSE COUNSEL]: ... I have not received any additional information, and it appears that the People do not intend to introduce any information regarding the blood....

"THE COURT: Other than in the photographs?

"[DEFENSE COUNSEL]: Other than in the photographs. And because I didn't have anything I prefer to file it and even if there is—it's not relevant because we don't have—I cannot test the blood at this point. I cannot have anything done to verify who is who, and that's why I'm submitting this motion. And we have [a] report that testings were not done regarding the blood, and that's why I didn't know whether there is something else that is coming up or is not coming up, but at this point it appears that nothing is coming up unless you intend some new test, DNA, or anything that that."

The prosecutor was not sure if the blood had been preserved, and defense counsel said he did not know.

"[DEFENSE COUNSEL]: So, Judge, obviously *the motion may be without merits. I just filed it because I didn't know what was coming up*." (Italics added.)

The court and the parties reviewed the reports and clarified the knife had been preserved, tested for fingerprints, and the tests were negative, but the blood had not been collected, preserved, or tested. Defense counsel stated:

"[DEFENSE COUNSEL]: Judge, I'm ready to withdraw the motion. If nothing that I don't know regarding the blood is coming, I don't have to file the motion because I don't know even that what is—

"THE COURT: Yeah. I don't think it's going to apply, but—

"[DEFENSE COUNSEL]: *No, it's not applying at all. I mean, it's not relevant. It doesn't apply*." (Italics added.)

After further discussion, however, defense counsel clarified his *Trombetta /Youngblood* motion:

15

"[DEFENSE COUNSEL]: What it is, Judge, is that to advise the Court is we don't know which blood is which, because the defendant the fact also his blood was in the room, too, all over, so that's why I don't know, but this indicated that there is no blood samples to test, so obviously there is ... nothing coming up and we will go with this."

The court replied:

"[I]t doesn't sound like there's a *Trombetta* issue and it sounds like whatever reports relate to the I. Bureau work have been exchanged, so whatever comes out, comes out. The People are subject to direct and cross-examination."

### C. Posttrial Motions

As set forth in the factual statement, Officer Masse was extensively questioned about the nature and location of the blood in the apartment, and why he directed the crime scene technician not to take any samples. The prosecution introduced photographic evidence of the two separate pools of blood in the living and dining rooms.

After defendant was convicted in the guilt phase, the court convened the jury trial on the sanity phase. Just before the sanity phase began, defendant personally addressed the court outside the jury's presence. Defendant complained the court never addressed his *Trombetta* motion. Defense counsel interrupted defendant and advised the court:

"[I]t is my recollection that I have addressed way back during the guilty trial. I explained to [defendant] it's not the right time to address motions in limine when the jury found him guilty. [Defendant] indicates that I have not addressed a motion that I filed, motion in limine regarding of not collecting the blood and not collecting a *Trombetta* motion at that time when we had, and he's been calling this a motion during the entire trial. And I'm saying it in the record, I don't have the specific recollections what was the ruling of the Court way back at the preliminary hearing [sic ]. I know that now in the sanity phase, obviously, we cannot address any motions. [¶] According to [defendant], the Court reserved the right of ruling to that motion, according to him, and his recollection; right?"

Defendant said his attorney should know what happened. Defense counsel said he did not specifically recall whether the court ruled on the *Trombetta* motion. The court replied that it did. Defendant again addressed the court and complained it did not rule on the *Trombetta* motion. Defense counsel clarified the *Trombetta* motion was based on the prosecution's failure to collect the blood at the scene.

The court again said it had ruled on the motion, and it had not precluded the parties from addressing the failure to collect and preserve the blood evidence. The court further noted defense counsel extensively addressed the issue during cross-examination of the witnesses, raised it in closing argument, and the issue was presented to the jury. Defendant complained there was no blood for the jury to consider. The court again said it denied the motion prior to trial. Defendant said his defense attorney did not talk about it. The court advised defendant not to be disruptive and moved on to other evidentiary issues for the sanity phase.

## D. Analysis

Defendant argues his due process rights were violated under *Trombetta* and *Youngblood* because of Officer Masse's failure to collect and preserve the blood found in the apartment. Defendant asserts Masse improperly made his decision based on Fulmer's statement at the scene, and assumed Fulmer's version of events was true and that her blood was on the living room floor. "Since the officers believed Fulmer and made their assumptions accordingly, they reached an expressed decision to not preserve any blood samples, including those on the towel and shirt. This precluded [defendant] from proving both pools of blood on the floor, or the bloody clothes, either were his alone or were a combination of his and Fulmer's which would have supported his claim that he did, in fact, act in self-defense." [N.17]

> [N.17] We note that while defendant filed a *Trombetta/Youngblood* motion in limine, defense counsel appeared to initially withdraw the motion based on his realization the prosecution had fully complied with discovery and there were no undisclosed blood-evidence reports. As the pretrial arguments continued, however, defense counsel clarified that the blood evidence should have been collected and preserved by the investigating officers. Defendant has thus preserved review of this issue.

Defendant's due process rights were not violated by the failure to collect and preserve the blood samples found in the apartment. The blood evidence did not "possess an exculpatory value that was apparent before [it] was destroyed." (*Trombetta, supra,* 467 U.S. at p. 489.) At trial, defendant testified that Fulmer initiated the assault, and that she stabbed him with a knife while he was sitting on the living room couch. However, defendant never accused Fulmer of stabbing him until he testified at trial. At the time of the investigation, Fulmer reported that defendant assaulted her in the living room, he beat her so violently that she lost consciousness three times, and she was bleeding from her forehead. Fulmer said she slipped in the blood when she tried to get up from the living room floor. Fulmer also said that when she ran out of the apartment, defendant was sitting on the dining room floor and holding a knife, but he had not stabbed himself.

When Officer Masse initially entered the apartment, he found defendant lying on the dining room floor in a pool of blood. His left wrist was cut and bleeding, and the knife was nearby. Masse found the second pool of blood in the living room. It had been slightly smeared, consistent with Fulmer's description of how she got up from the floor, but it was separate and apart from the blood in the dining room. There were no trails or drops to connect the two pools of blood, or connect the living room blood to the knife found in the dining room.

Defendant was not capable of speaking to the officers while he was still at the scene. At the hospital, however, defendant told the medical staff that he cut his left wrist with a steak knife while he was sitting down, he felt dizzy, and he laid down. Officer Masse interviewed him at the hospital and asked about the cut on his wrist. Defendant did not answer the question. Instead, he accused Fulmer of using drugs and cheating on him. Defendant also said they argued, he was angry, he "snapped," and his next recollection was waking up on the floor with the cut on his wrist. Defendant said he might have punched Fulmer, but he could not remember and he was not sure. Defendant never said Fulmer cut him with the knife.

Based on the facts presented to Officer Masse that night, the blood evidence did not "possess an exculpatory value that was apparent before [it] was destroyed...."

(*Trombetta, supra*, 467 U.S. at p. 489.) It was reasonable to conclude that defendant was lying in a pool of blood on the dining room floor which resulted from cutting his own wrist given the nature of the wound, the nearby knife, and his statements to Masse and the medical staff. It was also reasonable to conclude the blood in the living room resulted from defendant's assault upon Fulmer because she had not been stabbed with a knife, she had blunt force injuries, and there was no blood trail which connected the two scenes.

At most, the blood evidence appeared "potentially useful" that night, and it "could have been subjected to tests" that might have helped the defense. (*Youngblood, supra*, 488 U.S. at pp. 57, 58.) However, there is no evidence of bad faith in this case. It cannot be said that Officer Masse knew about the purported exculpatory value of the blood evidence when he directed the crime scene technician not to collect and preserve samples. (*Id*. at pp. 56–57, fn. *; *People v. DePriest, supra*, 42 Cal.4th at p. 42.) Defendant's vague statements at the hospital sought to justify the incident. He admitted he had slashed his own wrist, that he never said anything which undermined Fulmer's account of the assault, and that he never accused Fulmer of assaulting him until his belated claim at trial.

Defendant argues that it was unreasonable for Officer Masse to rely upon Fulmer's account of the assault when he decided not to collect the blood samples. Defendant asserts the scene in the living room was inconsistent with Fulmer's description of a violent struggle in which she fought for her life, because the living room was not otherwise disrupted aside from the blood and some movement of one table. However, Fulmer described a scenario where defendant, who was substantially larger than she, assaulted her on the couch, dragged her to the living room floor, and repeatedly slammed her head on the floor. Fulmer's struggle to push defendant off of her did not necessarily mean that the entire room would have been disrupted in the process.

Defendant also complains his due process rights were violated because the police failed to preserve the towels which Fulmer used to stop the bleeding from her head wound, since the blood on those two towels might have been exculpatory. As with the primary blood evidence, however, there was no apparent exculpatory value to these two towels, they might have been potentially useful, and there is no evidence of bad faith.

While the court denied defendant's *Trombetta*/*Youngblood* motion, it did not prohibit the defense from raising this issue at trial. Defense counsel extensively cross-examined Officer Masse and the crime scene technician about their failure to collect and preserve the blood samples, and obtained their concessions that they were not absolutely certain about the sources for the two separate pool of blood. In closing argument, defense counsel addressed Masse's failure to preserve the blood found in the apartment, and argued the prosecution only presented "allegations" about blood, it failed to introduce any real evidence about who the blood belonged to, and the prosecution had failed to prove defendant's guilt beyond a reasonable doubt.

We thus conclude the court properly denied defendant's *Trombetta*/*Youngblood* motion. The alleged exculpatory value of the blood evidence was not apparent that night. At most, the blood might have been "potentially useful," and there is no evidence of bad faith in Officer Masse's decision not to collect and preserve the blood.

Pullen, 2015 WL 847688, at *9–13

18

a. <u>Legal Standard</u>

Due process requires that the prosecution disclose exculpatory evidence within its possession. <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963); <u>Cooper v. Brown</u>, 510 F.3d 870, 924 (9th Cir.2007). A due process violation occurs "when the State suppresses or fails to disclose material exculpatory evidence"; in such a case, "the good or bad faith of the prosecution is irrelevant." <u>Illinois v. Fisher</u>, 540 U.S. 544, 547 (2004) (citing <u>Brady</u>, 373 U.S. at 83).

However, the Due Process Clause "requires a different result when . . . the State [fails] to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." <u>Arizona v. Youngblood</u>, 488 U.S. 51, 57 (1988). Failure to preserve such "potentially useful evidence" does not violate due process "*unless a criminal defendant can show bad faith on the part of the police*." <u>Id</u>. at 58 (emphasis added). The presence or absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence *at the time it was lost or destroyed*. <u>Id</u>. at 56–57.

b. <u>Analysis</u>

The blood evidence at issue here was at best the sort of "potentially useful evidence" referred to in <u>Youngblood</u>, and not the material exculpatory evidence addressed in <u>Brady</u>. Had the blood pools been preserved and tested, the most the petitioner could hope for was that the pools of blood would match the petitioner's and would thus be consistent with the petitioner having bled from his injury in the living room as well as in the kitchen. This in turn would lend some support to his claim that he sustained the injury to his arm in the living room. To be sure, the evidence would not have exonerated him in light of the overwhelming evidence against him, which included Petitioner's own statements to law enforcement at the scene.

In addition, Petitioner fails to show any bad faith on the part of law enforcement. There was no indication that the identities of the contributors to the pools of blood were at all relevant. All information at the time, which included Petitioner's own statements at the scene, indicated that the blood in the living room came from the victim as a result of Petitioner's assault, and the blood in the kitchen came from Petitioner's self-inflicted wound. Therefore, a fair-minded jurist could conclude that law enforcement did not act in bad faith in failing to preserve the blood

evidence for testing.  Accordingly, Petitioner fails to demonstrate that the state court rejection of his claim was an unreasonable application of Supreme Court precedent.  The claim should be denied.

2.  Prosecutorial Misconduct

Petitioner next alleges the prosecutor committed misconduct during closing arguments when he violated a mid-trial promise not to talk about the victim's prior criminal record, by asking the jury to look at what he knew was a deficient and therefore misleading document concerning the victim's criminal history.

Petitioner also raised this claim on direct appeal.  In the last reasoned decision, which was adopted by the California Supreme Court, the Fifth DCA denied the claim as follows:

> Defendant raises an issue of prosecutorial misconduct based on the prosecutor's closing argument about Fulmer's lack of a criminal record. As we will explain, Fulmer had prior misdemeanor convictions, and the court held they were too remote for impeachment purposes. In closing argument, the prosecutor criticized defendant's trial claim that Fulmer used crack; the prosecutor asked the jury to look at her record because she did not have a prior drug conviction. Defendant objected and the court overruled it.

> On appeal, defendant argues the prosecutor's argument about Fulmer's credibility was false and misleading because Fulmer had a criminal record, which the court excluded.

> ### A.  *Prosecutorial Misconduct*

> "A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.] In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' [Citation.] A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' [Citations.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1202.)

> "When the issue 'focuses on comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' [Citations.] Moreover, prosecutors 'have wide latitude to discuss and draw inferences from the evidence at trial,' and whether 'the inferences the prosecutor draws are reasonable is for the jury to decide.' [Citation.]" (*People v. Cole, supra*, 33 Cal.4th at p. 1203.)

> ### B.  *Motions in Limine*

> Defendant filed several pretrial motions in limine, including a motion to prohibit the prosecutor "from making improper and unconstitutional [closing] argument to

the jury," including any "[s]tatement, comment, remark or insinuation vouching for the credibility or integrity of prosecution witnesses."

During the lengthy pretrial hearings, the court reviewed defendant's motion and said: "I don't think it needs a lot of discussion." The court asked the prosecutor whether he understood his obligations, and he said that he did. Defense counsel stated:

> "[Y]our Honor, just for the record I had no doubt at all about [the prosecutor]. I'm going just with the books when I do these motions.... I apologize. [S]o I am going with the standard proceedings."

The court acknowledged that defense counsel was just making a record.

### C.  Fulmer's Trial Testimony and the CLETS Report

Fulmer testified for the prosecution. On cross-examination, defense counsel asked whether she tried to kill defendant, and she said no. Counsel asked if she had any criminal record. Fulmer replied: "Not that I know of," and then added, "Well, not recently, no." Defense counsel asked what she meant, and the court called for an unreported bench conference. When the court returned to the record, it instructed the jury that Fulmer's responses were stricken, and it was not to consider them for any purpose.

On redirect examination, the prosecutor asked for another bench conference, which was not reported. When the court returned to the record, the prosecutor said that in light of defense counsel's questions, he moved to introduce exhibit No. 32, Fulmer's certified CLETS "rap sheet" which showed "no arrests, no convictions in her history." Defense counsel did not object, and the court admitted it into evidence. The prosecutor conducted his redirect examination but did not ask Fulmer about her lack of a record.

### D.  Discovery of Fulmer's Prior Misdemeanor Conviction

During the next recess, the court stated the defense investigator had produced certified records from Fresno County Municipal Court, which showed Fulmer had a misdemeanor conviction for petty theft (§ 488) in 1989. There had been an outstanding arrest warrant, and she failed to appear several times. She was ultimately sentenced in 1992 or 1993 and received a two-year term on informal probation. The prosecutor agreed the records were authentic.

The court decided the prior misdemeanor conviction was too remote to be used to impeach Fulmer's credibility because it had occurred 20 years earlier, and she did not have any subsequent record.

> "[T]he questions [defense counsel] presented to the witness I struck and instructed the jury not to consider. I've admitted the certified CLETS of the District Attorney's Office presented in Exhibit 32. You know, the only other thing I would say is that this is now the second time in recent history in trials that I've conducted here ... where, quite frankly, the CLETS information isn't necessarily complete or accurate and, in fact, we've already had an instance of it in this case....But, nevertheless, this issue as far as I'm concerned is resolved. It would have been too remote in time to use as an impeachable prior ... and I'm not going to change the record or the complexion of the case for the jury at this time...."

21

The court noted it had similarly excluded defendant's prior misdemeanor conviction for criminal threats from 1997 because it was too remote.

Defense counsel asked:

> "Just not to mislead the jury, what will be court indication about the CLETS information, People's exhibit with the indicat[ion] that she's never had any record? And, obviously, and if counsel continues arguing that she's never had any record, what will be the Court position...."

The prosecutor said: "I will not argue that. I can tell you that." The court replied: "It opens the door, then we'll have another issue." The prosecutor added: "And I can assure the Court I would not argue that she does not have a record based on what we just had established through a Defense Exhibit."

### E. Further Discovery of Fulmer's Record

After the defense rested and prior to rebuttal, the prosecutor advised the court that he conducted further research and obtained a "STAR" report on Fulmer's prior records. It showed that Fulmer had been cited for violating Vehicle Code section 14601 in 1990 and 1992 (driving on a suspended or revoked license), and the charges were apparently dismissed for insufficient evidence. It also showed "a filed DUI" in 1991 but "nothing" came of it. [N.18]

> [N.18] The prosecutor also advised the court that the STAR records revealed Espinoza's prior record. The parties subsequently stipulated to the jury that Espinoza had a misdemeanor conviction for grand theft in 2000.

The court stated the new records did not change its ruling, and Fulmer could not be impeached. [N.19]

> [N.19] On appeal, defendant does not challenge the court's decision to prohibit impeachment of Fulmer with her prior misdemeanor conviction or the Vehicle Code charges. While petty theft is a crime of moral turpitude, the court did not abuse its discretion when it decided to exclude evidence of Fulmer's 1989 misdemeanor conviction as too remote, particularly since she did not suffer any subsequent convictions. (Cf. *People v. Mendoza* (2000) 78 Cal.App.4th 918, 925–926; *People v. Green* (1995) 34 Cal.App.4th 165, 182–183.)

Defense counsel returned to the issue of Fulmer's prior misdemeanor theft conviction in 1992, and its omission from the CLETS report, which had been introduced into evidence. Defense counsel complained "the presentation by the People is not complete, again, because they don't include the '92 record from the [section] 488 that we have." The court replied it had already ruled on the issue.

### F. Closing Argument

The prosecutor did not address Fulmer's record in his initial closing argument. In defense counsel's closing argument, he attacked Fulmer's credibility and argued she gave inconsistent statements about the incident, and defendant's testimony was more consistent with the evidence.

In rebuttal argument, the prosecutor addressed asked the jury to review the instruction regarding the factors to evaluate the credibility of the witnesses:

"Was the witness' testimony influenced by a factor, such as bias or prejudice, a personal relationship with someone involved in the case or a personal interest in how this case is decided? You know, I think it's interesting. The defendant during cross mentioned that he's a drug addict and he mentioned that's why he didn't really care about [his prior conviction] is because he had drugs in his pocket and he was going to get popped for that anyway. And he made sure when Officer Masse questioned him at the hospital and then when he was on the stand *all these shots at his wife, crack addict, crack.* [N.21] *Never once did she try to throw shots at him. She didn't try to show anything else in there. She just answered the questions, and you can look at her criminal history. You won't even see a drug arrest, and I'll develop this further ....*" (Italics added.)

[N.21] At trial, defendant testified his prior domestic altercations with Fulmer occurred when she wanted to smoke "weed" and "crack," and she cheated on him with various unknown men. Officer Masse testified that when he interviewed defendant at the hospital, defendant said, among other things, that Fulmer smoked crack, and he could not sleep because she would leave the apartment and cheat on him.

Defense counsel objected to the prosecutor "looking to her criminal history pursuant to the prior Court's indication." The court overruled the objection and the prosecutor moved to another topic.

Later in his rebuttal argument, the prosecutor again addressed defendant's attacks on Fulmer's credibility:

"[Defendant] starts with two things trying to just, you know, make her look not credible. She's, essentially, a whore and she's a crack addict and a druggie. That's what he told the first officer...."

Defense counsel did not object. The prosecutor argued that defendant tried to "trash" Fulmer's credibility with his baseless allegations about child molestation, which he didn't report to child protective services until three years after he was arrested in this case, and which were deemed unfounded. "He already trashed her physically on September 1st, 2009, and *now he wants to trash her reputation* and just make her look like someone she isn't...." (Italics added.) Defense counsel did not object.

### G. Analysis

Defendant asserts the prosecutor committed misconduct by introducing the CLETs report which failed to list Fulmer's petty theft conviction, attesting that he would not argue that she lacked a criminal record, and then arguing in rebuttal that Fulmer was credible because she did not have a criminal record.

We first note there is no evidence the prosecutor intentionally or even negligently withheld any information from the court or the defense about Fulmer's criminal record. Both the court and the prosecutor expressed their frustration the CLETs report was incomplete. Indeed, the court acknowledged that it had recently been faced with incomplete and inaccurate CLETs reports in other cases. After the defense investigator produced court records about Fulmer's petty theft conviction, the prosecutor continued to investigate the matter and obtained the STAR report, which disclosed Fulmer's dismissed cases for driving without a license and the DUI, and Espinoza's prior conviction. The court found the prosecutor's further

investigation demonstrated "the responsibility of a diligent prosecutor to follow up" and to "make sure that every representation he's made to the Court on behalf of the People is correct and accurate." Defense counsel did not dispute the court's finding or allege the prosecutor engaged in any misconduct as to the production of Fulmer's criminal history.

We also note that while defense counsel objected to one portion of the prosecutor's rebuttal argument, he did not raise a specific prosecutorial misconduct objection or request an admonition, and he did not object to the prosecutor's subsequent reference to Fulmer's credibility. "To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct. [Citation.]" (*People v. Price* (1991) 1 Cal.4th 324, 447; *People v. Silva* (2001) 25 Cal.4th 345, 373.) The defendant will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile. (*People v. Hill* (1998) 17 Cal.4th 800, 820.) There is nothing in the record to reflect that it would have been futile for defense counsel to request an admonition after the first objection, or to lodge further objections to subsequent rebuttal argument.

In any event, it is important to note the context in which the prosecutor addressed Fulmer's record. Defendant testified that Fulmer assaulted him on the couch with the knife and slit his wrist. Defendant also testified that Fulmer used crack, she cheated on him with various unknown men, she previously put something in his food to knock him out, and she and various unknown men were somehow involved in molesting his grandchild. In his closing argument, defense counsel argued Fulmer's account of the assault was not credible, and defendant's testimony was more consistent with the evidence.

In this light, the prosecutor used his rebuttal argument to undermine defendant's trial accusations against Fulmer, particularly defendant's claim that she used crack: "*[Y]ou can look at her criminal history. You won't even see a drug arrest, and I'll develop this further....* " (Italics added.) Defense counsel immediately objected, and the prosecutor moved on to another topic. Later in rebuttal, the prosecutor again attacked defendant's claim that Fulmer was "a whore" and "a crack addict and a druggie," and accused defendant of "trashing" her reputation. Defense counsel did not object to the latter statements.

The prosecutor did not misstate the record when he said that Fulmer's record did not show "even" a drug arrest. He never said she did not have *any* criminal record, and his rebuttal argument did not constitute prejudicial misconduct. Fulmer's record consisted of Vehicle Code violations which were dismissed, a misdemeanor petty theft conviction in 1989 which resulted in informal probation, and no other citations, arrests, or convictions. The prosecutor did not misstate or mislead the jury on this point—Fulmer's entire record had been obtained, and she did not have any drug related arrests or convictions. In addition, the admission of the CLETs report was not prejudicial, even though it failed to include the misdemeanor petty theft conviction, since the court found it was too remote to be used for impeachment and excluded it from evidence.

Pullen, 2015 WL 847688, at *13–17.

        a.  Legal Standard

Under clearly established federal law, a prosecutor's improper comments will be held to

violate the Constitution only if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Parker v. Matthews, 567 U.S. 37, 132 S.Ct. 2148, 2153 (2012) (per curiam) (quoting Darden v. Wainright, 477 U.S. 168, 181–183 (1986)). Improper argument does not, per se, violate a defendant's constitutional rights. Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002) (citing Thompson v. Borg, 74 F.3d 1571, 1576 (9th Cir.1996)). The Court must determine whether the alleged misconduct has rendered a trial fundamentally unfair. Darden, 477 U.S. at 183.

To grant habeas relief, this Court must conclude that the state court's rejection of the prosecutorial misconduct claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Parker, 132 S.Ct. at 2155 (quoting Harrington, 131 S.Ct. at 767–87).

In determining whether the prosecutor's remarks rendered a trial fundamentally unfair, the remarks must be analyzed in the context of the entire proceeding. Boyde v. California, 494 U.S. 370, 385 (1990); Darden, 477 U.S. at 179-182. Furthermore, counsel are "given latitude in the presentation of their closing arguments, and courts must allow the prosecution to strike hard blows based on the evidence presented and all reasonable inferences therefrom." Ceja v. Stewart, 97 F.3d 1246, 1253– 1254 (9th Cir.1996) (quoting United States v. Baker, 10 F.3d 1374, 1415 (9th Cir.1993)). A reviewing court should consider challenged remarks in light of the realistic nature of closing arguments at trial. "Because 'improvisation frequently results in syntax left imperfect and meaning less than crystal clear,' 'a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.'" Williams v. Borg, 139 F.3d 737, 744 (9th Cir. 1998) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 646–647 (1974)). Factors to be considered in determining whether habeas corpus relief is warranted include whether the prosecutor manipulated or misstated the evidence; whether his comments implicated other specific rights of the accused; whether the objectionable content was invited or provoked by defense counsel's argument; whether the trial court admonished the jurors; and the weight of evidence against the defendant. Darden, 477 U.S. at 181-82. Finally, even

when prosecutorial misconduct rises to the level of a due process violation, such misconduct provides grounds for habeas relief only if that misconduct is prejudicial under the harmless error test articulated in Brecht v. Abrahamson, 507 U.S. 619, 637–638 (1993).

### b. Analysis

The Fifth DCA reasonably determined that the prosecutor's comments did not constitute misconduct. As noted by the respondent, the prosecutor did not misstate the evidence. In response to Petitioner's characterization of the victim as a crack addict and a druggie, the prosecutor directed the jury to the victim's criminal record and argued that the victim had not sustained a single drug arrest. This was an accurate statement of her criminal record and fair argument considering Petitioner's attack on the victim's reputation and credibility. That the CLETS report did not contain earlier vehicle code violations or a petty theft conviction was not prejudicial, since the trial court had ruled them inadmissible as too remote in time.

Certainly, a rational jurist could have found that the prosecutor's remark did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." Darden, 477 U.S. at 183. Therefore, the claim should be rejected.

### 3. Juror Misconduct

Finally, Petitioner claims the trial court violated his constitutional rights to an impartial jury, a fair trial, and due process during the sanity phase of the trial when it refused to investigate whether Juror No. 12 was at times sleeping through the trial.

This claim was also raised on direct appeal and denied by the Fifth DCA in the last reasoned decision, as follows:

> As mentioned above, defendant pleaded not guilty, and not guilty by reason of insanity. After his conviction on the substantive offenses, the same jury heard evidence in the sanity phase and found he was sane when he committed the offenses.

> As to the sanity phase, defendant contends the court abused its discretion when it failed to investigate allegations that Juror No. 12 was asleep during his sanity trial, and the court should have granted his motion for a new sanity trial because of these allegations. As the record will show, the court carefully monitored the jurors' responsiveness and attention levels during the lengthy proceedings, and it did not abuse its discretion in this matter.

## A. Juror Misconduct and New Trial Motions

Section 1089 authorizes the trial court to discharge a juror at any time before or after the final submission of the case to the jury if, upon good cause, the juror is "found to be unable to perform his or her duty." Such good cause may exist if a juror is sleeping or inattentive. (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 411; *People v. Bradford* (1997) 15 Cal.4th 1229, 1349 (*Bradford*); *People v. Bonilla* (2007) 41 Cal.4th 313, 350 (*Bonilla*); *People v. Johnson* (1993) 6 Cal.4th 1, 21, overruled on other grounds by *People v. Rogers* (2006) 39 Cal.4th 826, 878–879.)

Once the court is placed on notice that good cause to discharge a juror may exist, "it is the court's duty 'to make whatever inquiry is reasonably necessary' to determine whether the juror should be discharged. [Citation.]" (*People v. Espinoza* (1992) 3 Cal.4th 806, 821.) "A juror's inability to perform ... 'must appear in the record as a "demonstrable reality" and bias may not be presumed.' [Citation.]" (*People v. Beeler* (1995) 9 Cal.4th 953, 975.) "A juror must not be discharged for sleeping unless there is convincing proof the juror actually slept during trial. [Citations.]" (*People v. Bowers* (2001) 87 Cal.App.4th 722, 731.)

Both the scope of the court's inquiry and the ultimate decision whether to retain or discharge a juror are committed to the sound discretion of the trial court. (*Bonilla, supra,* 41 Cal.4th at p. 350.) If any substantial evidence exists to support the trial court's exercise of its discretion under section 1089, the court's action will be upheld on appeal. (*Bradford, supra,* 15 Cal.4th at p. 1351.)

The court has the discretion whether to conduct an evidentiary hearing to resolve factual disputes raised by a claim of juror misconduct. (*People v. Avila* (2006) 38 Cal.4th 491, 604.) "[T]he mere suggestion of juror 'inattention' does not require a formal hearing disrupting the trial of a case. [Citation.]" (*People v. Espinoza, supra,* 3 Cal.4th at p. 821.) A trial court's "self-directed inquiry, short of a formal hearing," may be adequate under the state and federal Constitutions where the court is alert to the danger of juror inattention, closely observes the jurors, and makes specific observations about their demeanor. (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1234.)

When a defendant moves for a new trial based on jury misconduct, the trial court undertakes a three-part inquiry. "First, the court must determine whether the evidence presented for its consideration is admissible.... [¶] Once the court finds the evidence is admissible, it must then consider whether the facts establish misconduct.... [¶] Finally, if misconduct is found to have occurred, the court must determine whether the misconduct was prejudicial. [Citations.]" (*People v. Duran* (1996) 50 Cal.App.4th 103, 112–113.) "'As a general rule, juror misconduct "raises a presumption of prejudice that may be rebutted by proof that no prejudice actually resulted." [Citations.]' [Citation.] In determining whether misconduct occurred, '[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence. [Citations.] Whether prejudice arose from juror misconduct, however, is a mixed question of law and fact subject to an appellate court's independent determination. [Citations.]' [Citation.]" (*People v. Majors* (1998) 18 Cal.4th 385, 417.)

## B. The Sanity Phase

On October 23, 2012, defendant's jury trial began in the guilt phase on the substantive offenses. On November 5, 2012, defendant was convicted as charged,

and the great bodily injury enhancements were found true.

On November 7, 2012, the court convened the sanity phase with the same jury. The defense presented expert testimony from Dr. Howard Terrell, a psychiatrist, and Dr. Laura Geiger, a psychologist, who testified defendant was not legally sane when he committed the offenses.

After Dr. Geiger's defense testimony, defendant refused to appear in court for the remainder of the sanity phase trial.

The prosecution's experts were Dr. Philip Seymour, a psychologist, and Dr. Thomas Callahan, a psychiatrist, who testified to the opposite conclusion, that defendant was legally sane when he attacked Fulmer. All four experts testified in great detail about defendant's lengthy mental health history and were subject to extensive cross-examination about their conclusions.

### C. The Court's Discussion About the Jurors

During the sanity phase, the court repeatedly expressed its concern about the lengthy trial's potential impact on the jurors' financial situations and their attention spans. On the second day of the sanity phase, the court noted that Juror No. 8 worked in the evenings, he had been late the previous day, and he "was sitting there with his eyes closed a good portion of the time yesterday." The prosecutor said he noticed the same thing. The court said that other jurors were doing that too and encouraged the parties to stay on schedule.

Defense counsel said he wanted the jury to pay attention, but he would be open to a mistrial on the sanity phase. The court admonished defense counsel for causing further delays with untimely motions. Counsel replied he was doing his best to obtain the necessary medical records for the sanity phase. The court said that the records that defense counsel had just produced were inadmissible and directed the parties to press on.

Later in the sanity phase, the court said the jurors were sitting very patiently, but they were becoming alienated from the process and it was taking too long.

### D. Comments About Whether the Jurors were Sleeping

On November 15, 2012, the jury retired to deliberate in the sanity phase. While the jury was outside the courtroom, defense counsel told the court that he had received information from Curtis McAfee, a paralegal student who had been sitting in the courtroom and observing the trial. McAfee told counsel that one of the jurors was asleep for a half-hour the previous day. Defense counsel said he had been watching the juror, but he had not seen anyone sleeping. The prosecutor said McAfee also told him that a juror was sleeping and had pointed to Juror No. 12's seat.

The court said it had been monitoring the entire jury and had been concerned about Juror No. 8, who had been working in the evenings. The court noticed Juror No. 8's eyes were closed but kept watching and determined it was a "listening technique," and Juror No. 8 was otherwise moving around in the chair. The court had seen other jurors periodically close their eyes and rest for short periods of time. The court had never seen Juror No. 12 fall asleep or "go into behavioral modes that might think [sic ] he was sleeping." The court said it never saw anything that would have required stopping the proceedings.

The prosecutor agreed with the court's observations about Juror No. 8, and said he watched Juror No. 8 and realized the juror was engaged and listening even when the juror's eyes were closed. The prosecutor had not seen Juror No. 12's eyes shut during trial.

The courtroom deputy provided the most detail about Juror No. 12, and said that McAfee brought the matter to the deputy's attention at the time.

> "[McAfee] waved at me in the middle of [sic ] and I looked at him and he put his hands together like someone was sleeping and then pointed to the jury box. When I looked over I saw Juror Number 12 with his eyes closed. He—I don't know if he was asleep or not, but Juror 11 looked at me and I told her to shake Juror 12, and *when she shook him he didn't appear to have been startled like he was awoken [sic]. He just simply opened his eyes.*" (Italics added.)

The court decided not to take further action and it did not question Juror No. 12.

Later on November 15, 2012, the jury found defendant was sane when he committed the offenses.

### E. Motion for New Trial

Defendant filed a motion for a new sanity trial, primarily based on the claim that the jury failed to properly deliberate because the verdict was returned in a short time. [N.23] Defendant also argued a new trial should be granted because Juror No. 12 was asleep and the court failed to investigate the matter.

> [N.23] Defendant's motion asserted the jury deliberated for four minutes. According to the minute order, the jury deliberated for 11 minutes.

Defendant's motion was supported by an unsworn declaration from the defense investigator, who spoke to McAfee after the trial. According to the investigator's declaration, McAfee said he saw a juror who was sound asleep for about 30 minutes. McAfee said he notified the bailiff, who spoke to the court reporter. McAfee also told the defense attorney what he saw. [N.24]

> [N.24] McAfee, who allegedly saw Juror No. 12 was asleep, did not appear at the hearing on the new trial motion. The defense submitted an unsworn memo from the defense investigator about his unsuccessful efforts to subpoena McAfee to testify at the hearing on the new trial motion.

### F. Hearing on New Trial Motion

At the hearing on the new trial motion, the parties primarily addressed the length of deliberations and whether the jurors had performed their sworn duties or rushed to a verdict in the sanity phase.

The court also addressed defendant's claim that Juror No. 12 was asleep for 30 minutes during the sanity phase. The court accepted the declaration from the defense investigator about his unsuccessful efforts to subpoena and obtain the presence of McAfee, who purportedly saw that Juror No. 12 was asleep.

In arguing the motion, both the prosecutor and defense counsel stated they met with members of the jury after the sanity verdicts were returned and the jurors

were excused. Defense counsel could not recall if Juror No. 12 was present for this conversation. The prosecutor said Juror No. 12 was present and participated in a collective conversation and group dialogue with both attorneys and the other jurors about the case.

The court asked the parties whether any of the jurors said anything which would question the integrity of the verdict. The prosecutor said no. Defense counsel said he did not have that impression.

The court met with the jurors before they spoke with the two attorneys. The court thanked the jurors for their service, did not address the specific facts of the case, and offered to answer questions about the trial process. "And in the course of that I'm looking for things that might indicate that there is a reason to doubt the integrity of the verdict." The judge had experienced situations following other trials where jurors disclosed they were not comfortable with the verdict or something similar. "No one disclosed to me any level of discomfort with the verdict."

The court stated that if the jurors "who remained behind" had any misgivings about the verdict after they were discharged, "don't you think you would have heard it? Don't you think somebody would have said something was wrong here? Don't you think that some at least inkling of discomfort from some of the jurors or a juror would have been exposed to you? Why do you think I polled the jury? That's why I do that. I don't trust the fact that a piece of paper can be handed to me signed off by one person and that necessarily indisputably accounts for what happened in a jury room. That's why I go through that process. That's why I ask each and every one of those jurors, and I ask them two things. I ask them, is this your verdict and is this the verdict that you reached unanimously with everybody else?"

The court also addressed the jurors' attention levels during the sanity phase.

> "There were times when I brought it up on my own motion. There were times when it was brought to my attention by the deputy, I believe, and by Madam Clerk, I believe, at one time. There was a time when this person who was out in the audience brought it to somebody's attention and we acted on it. I made a record during the trial that I was monitoring the attention level of everybody ... in that jury and I was concerned about it at all times. I specifically focused on people who I thought might be dozing off, and I looked to monitor what their actual listening behaviors were. There were people who did, in fact, look to be nodding off, but I could see that they were in fact doing something with their hands or with their leg that they would acknowledge certain voice intonations or certain changes in loudness or something like that. I was monitoring the thing through the entire process."

The court found there was no reason to doubt the integrity of the jury's verdict, and no evidence the verdict was misguided or the product of some bias or malfeasance.

### G. Analysis

Defendant raises two issues. First, defendant contends the court should have halted the jury's deliberations during the sanity phase and conducted an investigation into whether Juror No. 12 had been sleeping during the trial. Second, defendant argues that since the court failed to question any of the jurors about this issue, it should

have granted his motion for a new sanity trial because it was impossible to determine whether Juror No. 12 heard the disputed testimony about defendant's sanity.

The court did not ignore defense counsel's information that Juror No. 12 was allegedly sleeping. Indeed, the court repeatedly stated that it was monitoring the jurors' attention levels, and encouraged the parties to expeditiously present their cases in order to avoid a mistrial because of the lengthy proceedings.

When defense counsel advised the court about McAfee's information that Juror No. 12 appeared to have been sleeping, the court immediately responded to counsel's concern and began the inquiry by questioning courtroom personnel. While the attorneys had been concerned about Juror No. 8, they had not noticed whether Juror No. 12 had been asleep. The court said it had never seen Juror No. 12 fall asleep or "go into behavioral modes that might think [sic] he was sleeping," or anything that would have required stopping the trial.

The courtroom deputy provided the detailed explanation that Juror No. 12's eyes were closed. The deputy did not know if Juror No. 12 was asleep; Juror No. 11 shook Juror No. 12; and, upon being shaken, Juror No. 12 "didn't appear to have been startled like he was awoken [sic]. He just simply opened his eyes."

The court did not abuse its discretion by the nature of its inquiry or its decision not to take further action. Although defendant argues the court should have conducted a formal inquiry of Juror No. 12 and the other jurors, the trial court monitored the entire jury during the lengthy trial and it was "in the best position to observe" the jurors' demeanors and determine if additional inquiries were required. (*People v. Beeler, supra*, 9 Cal.4th at p. 989, overruled on other grounds in *People v. Pearson* (2013) 56 Cal.4th 393, 462; *People v. Schmeck* (2005) 37 Cal.4th 240, 298.) The court's "self-directed inquiry" resulted in the explanation by the courtroom deputy which addressed the concern raised by McAfee during deliberations. Moreover, the deputy's explanation rebutted defendant's later allegations, based on the investigator's unsworn hearsay declaration, that McAfee said Juror No. 12 was asleep during the sanity phase.

Based on the record before the court, it did not abuse its discretion when it addressed defense counsel's concerns about Juror No. 12 or when it denied defendant's motion for a new sanity trial.

Pullen, 2015 WL 847688, at *17–21.

        a.  Legal Standard

While criminal defendants have a Sixth Amendment right to trial by a fair and impartial jury, Duncan v. Louisiana, 391 U.S. 145, 149 (1968), Irvin v. Dowd, 366 U.S. 717, 722 (1961), not every incident of juror misconduct requires a new trial, United States v. Hendrix, 549 F.2d 1225, 1229 (9th Cir.), *cert. denied*, 434 U.S. 818 (1977).  The presence of a sleeping juror during trial does not, per se, deprive a defendant of due process, a fair trial, or an impartial jury.  Tanner v. United States, 483 U.S. 107, 126-27 (1987).

31

"The trial judge has considerable discretion in determining whether to hold an investigative hearing on allegations of jury misconduct and in defining its nature and extent." United States v. Barrett, 703 F.2d 1076, 1083 (9th Cir. 1983). Where a juror has been found to be sleeping, a new trial may not be required if the court determines the juror "did not miss essential portions of the trial and was able fairly to consider the evidence." Id. at 1083 n. 13.

### b. Analysis

The state trial court conducted an inquiry into the matter when it was brought to its attention. The court noted its own careful observations of the jury throughout the sanity phase in light of the length of the trial. It noted one juror who closed his eyes did not appear to be asleep; rather, it appeared to be a listening mechanism since the juror would visibly respond to the testimony even though his eyes were closed. As to Juror No. 12, the trial judge stated that despite having carefully watched the jury throughout the trial, he had never seen Juror No. 12 fall asleep. He inquired with others about the juror. The bailiff stated that at one point he watched another juror nudge Juror No. 12, but Juror No. 12 was not startled awake and merely opened his eyes. Following this inquiry, the court determined as a matter of fact that sleep was not a problem for the jurors in question. Petitioner fails to point to any clear and convincing evidence to rebut this factual determination. Accordingly, the Court must presume that the state court determined correctly that the jurors did not sleep during a significant portion of the trial, see 28 U.S.C. § 2254(e)(1), and therefore, that the jurors' behavior did not rise to the level of a constitutional violation. See Barrett, 703 F.2d at 1083 n. 13 ("[E]ven if the juror in the present case is found to have been asleep during portions of the trial, a new trial may not be required if he did not miss essential portions of the trial and was able fairly to consider the case."); see also United States v. Springfield, 829 F.2d 860, 864 (9th Cir. 1987) (denying sleeping juror claim where trial court had found that juror missed only "insubstantial" portions of the trial). Therefore, the claim should be denied.

## IV.    RECOMMENDATION

Accordingly, the Court RECOMMENDS that the Petition for Writ of Habeas Corpus be DENIED with prejudice on the merits.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within twenty-one days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the Objections shall be served and filed within ten court days after service of the Objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: __April 24, 2017__                    _____/s/ Jennifer L. Thurston_
                                                    UNITED STATES MAGISTRATE JUDGE